1  Adam M. Apton (SBN 316506)
2  **LEVI & KORSINSKY, LLP**
3  445 South Figueroa Street, 31st Floor
   Los Angeles, California 90071
4  Tel: 213/985-7290
   Fax: 202/333-2121
5  Email: aapton@zlk.com

6
7  *Attorneys for Plaintiffs*

8  [Additional counsel on signature page]

9
          UNITED STATES DISTRICT COURT
10
          CENTRAL DISTRICT OF CALIFORNIA
11
          WESTERN DIVISION
12

| | |
|---|---|
| 13 FIVET INVESTMENT MANAGEMENT LTD and DEEP FIELD FUND SPC LTD. OPEN CLUSTER SEGREGATED PORTFOLIO, | Case No. 2:18-cv-03512-DMG-RAO |

13  FIVET INVESTMENT MANAGEMENT    )   Case No. 2:18-cv-03512-DMG-RAO
14  LTD and DEEP FIELD FUND SPC LTD.  )
    OPEN CLUSTER SEGREGATED        )   **SECOND AMENDED**
15  PORTFOLIO,                     )   **COMPLAINT FOR:**
                                   )
16                     Plaintiff,  )   **(1)  COMMON LAW FRAUD**
                                   )
17        vs.                      )
                                   )   **(2)  NEGLIGENT**
18                                 )        **MISREPRESENTATION**
    DARREN R. JAMISON, CAPSTONE    )
19  TURBINE CORPORATION, and DOES 1- )
    10,                            )   **(3)  VIOLATION OF CAL. CORP.**
20                                 )        **CODE §25401**
                                   )
21                    Defendants.  )
                                   )   DEMAND FOR JURY TRIAL
22  _____ )

23
24
25
26
27
28

Plaintiffs FiveT Investment Management Ltd ("FiveT") and Deep Field Fund SPC Ltd. Open Cluster Segregated Portfolio ("Deep Field Fund") (collectively, "Plaintiffs"), by their undersigned attorneys, allege the following on information and belief, except as to those allegations pertaining to their own knowledge and conduct, which is made on personal knowledge:

## **INTRODUCTION**

1.      Plaintiffs bring this action to recover losses they sustained in connection with their purchase of over $30 million of Capstone Turbine Corporation ("Capstone") stock. Plaintiffs made their purchases of Capstone stock following conversations with Defendant Darren R. Jamison ("Jamison"), Capstone's Chief Executive Officer. During these conversations, Jamison made material misrepresentations and/or omissions to Plaintiffs about Capstone's revenue, sales, and operations. These statements induced Plaintiffs to purchase Capstone stock.

2.      Jamison lied during these conversations. Specifically, Jamison did not disclose that Capstone had been improperly recognizing revenue from BPC Engineering ("BPC") in violation of Capstone's stated accounting policies as well as accounting rules and regulations. Jamison and Capstone had been violating these rules at all relevant times, thereby causing Capstone's revenue to be materially inflated.

3.      Similarly, unbeknownst to Plaintiffs, Capstone's "backlog" (which includes orders received but not yet filled or paid for) included millions of dollars of orders from BPC. These orders were unlikely ever to be filled, let alone paid for. Nonetheless, Jamison and Capstone relied upon the backlog when discussing the company's current and future financial strength. Given that the backlog included many orders that were likely never to be filled, these statements were materially misleading.

4.      Plaintiffs relied on these misrepresentations and/or omissions as well as others that were present within Capstone's press releases and public filings with the U.S. Securities and Exchange Commission ("SEC"). As a result, Plaintiffs sustained significant damages in

the form of financial losses when the truth concerning Capstone's revenue and backlog emerged.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332.

6.      The parties in this case are citizens of different states and/or foreign states.

7.      The amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1367.

9.       Venue is proper because many of the acts and conduct complained of herein occurred in this District and Capstone is headquartered in this District.

## PARTIES

10.      Plaintiff FiveT is a fund located in the Cayman Islands. On May 1, 2014, FiveT purchased 9,000,000 shares of Capstone common stock from Deep Field Fund in a private transaction for $13,050,000. FiveT subsequently purchased 1,000,000 additional shares of Capstone common stock for a total of $705,440.70 between February 2015 and May 2015.[1]

11.      Plaintiff Deep Field Fund is a fund located in the British Virgin Islands. On May 1, 2014, Deep Field Fund purchased 18,825,000 shares of Capstone common stock from Capstone in a public offering pursuant to a prospectus and registration statement filed with the SEC. Deep Field Fund purchased these shares for $1.70 per share, resulting in proceeds (before expenses) to Capstone totaling $30,242,363.

12.      Non-party ISATYS Advisory AG ("Isatys") was Deep Field Fund's mandated asset manager at all relevant times herein. Isatys does not have any trading or investment accounts. All of Deep Field Fund's accounts are in the name of Deep Field Fund. Isatys places

---

[1] On November 9, 2015, Capstone completed a 20-for-1 reverse stock split. Allegations concerning share amounts and prices occurring prior to this date reflect the pre-split amounts and prices; allegations after this date reflect the post-split amounts and prices.

SECOND AMENDED COMPLAINT

orders for the benefit of Deep Field Fund. Isatys did not take possession of the Capstone stock Deep Field Fund purchased from Capstone at issue herein.

13.     Defendant Capstone is a Delaware corporation that trades on the NASDAQ Stock Market ("NASDAQ"), a national securities exchange, with its principal executive offices located at 16640 Stagg Street, Van Nuys, California 91406. At all relevant times, Capstone, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the company's common stock.

14.     Defendant Jamison was, at all relevant times, President, Chief Executive Officer ("CEO") and a director of Capstone. Defendant Jamison joined Capstone in December 2006 as President and CEO and has been a director since December 2006. Upon information and belief, Jamison resides in the State of California.

15.     The true names and capacities of defendants named as Does 1-10, inclusive, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiffs. Plaintiffs therefore sue these defendants by these fictitious names. Plaintiffs will amend the Complaint to substitute true names and capacities when they have been ascertained. Plaintiffs are informed and believe, and on the basis of that information and belief allege, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged.

16.     Capstone, Jamison, and Does 1-10 are collectively referred to herein as "Defendants."

17.     Jamison and Does 1-10 are collectively referred to herein as the "Individual Defendants."

18.     The Individual Defendants, because of their positions with Capstone, possessed the power and authority to control the contents of Capstone's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Capstone's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance

and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.     Capstone is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful act complained of herein were carried out within the scope of their employment with authorization.

20.     The scienter of the Individual Defendants, and other employees and agents of Capstone are similarly imputed to Capstone under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A.   Background

21.     Capstone develops, manufactures, markets and services microturbine technology products for use in power-generation applications.

22.     Capstone sells its microturbine products, parts and service through a large network of distributors. These distributors purchase Capstone's products for sale to end users and also provide application engineering and installation support. At all relevant times, Capstone's primary distributor in Russia was BPC.

23.     BPC's relationship with Capstone was material to Plaintiffs in the overall context of Capstone's operations. BPC was one of Capstone's largest customers and always had the largest amount of orders in Capstone's backlog. For the years ended March 31, 2014, 2013, and 2012, respectively, sales to BPC accounted for 17%, 11% and 26% of the company's overall revenue.

24.     Absent from Defendants' statements about Capstone was any indication that BPC was unable to pay Capstone the amounts it owed and, therefore, Capstone's revenue and backlog was materially less than represented.

25.     Capstone's revenue recognition policy was, at all relevant times, as follows:

We recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists, delivery has occurred or service has been rendered, selling price is fixed or determinable and collectability is reasonably assured. Service revenue derived from time and materials contracts is recognized as the service is performed.

***

Revenue from the sale of products, parts and accessories is generally recognized and earned when all of the following criteria are satisfied: (a) persuasive evidence of a sales arrangement exists; (b) price is fixed or determinable; (c) collectability is reasonably assured; and (d) delivery has occurred. Delivery generally occurs when the title and the risks and rewards of ownership have substantially transferred to the customer.

26.     Capstone's revenue recognition policy tracks Staff Accounting Bulletin No. 101 ("SAB 101"), as amended by Staff Accounting Bulletin No. 104 ("SAB 104"). SAB 104, Topic 13, *Revenue Recognition*, as amended, and SAB 101, *Revenue Recognition in Financial Statements*, clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met: (a) "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction; (b) "Delivery has occurred or services have been rendered;" (c) "The seller's price to the buyer is fixed or determinable;" and (d) "Collectibility is reasonably assured." SAB 101(A)(1).

27.     Additionally, FASB Statement of Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises articulates that revenues and gains should not be recognized in financial statements until they are both earned and realizable:

(a) "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services),

merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [FASB Statement of Concepts No. 5, 83a]."

(b) "Revenues are not recognized until earned. An entity's revenue activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [FASB Statement of Concepts No.5, 83b]."

(c) "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [FASB Statement of Concepts No. 5, 84a]."

28.    Moreover, if collectability is not reasonably assured, revenues should be recognized on the basis of cash received. *See* FASB Statement of Concepts No. 5, 84g.

29.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

30.    Notwithstanding the foregoing, Capstone recognized revenue from BPC as if it was reasonably assured when, in fact, it was not. Prior to the beginning of 2014, Capstone placed BPC on a credit hold. Capstone placed the credit hold on BPC because of a previous and ongoing outstanding balance owed from BPC of approximately $2 million. When a customer was put on a credit hold, they were required to pay the full purchase price in cash prior to shipment. This was also referred to as being placed on "cash-only" status. BPC was on a credit hold prior to 2014 and was on a credit hold through at least October 2015.

31.    During the period of the credit hold, Capstone did not ship products to BPC unless the shipments were prepaid. Further, while BPC was subject to the credit hold, Capstone's shipment system would not allow shipments to be scheduled to BPC without authorization

from Capstone's Chief Financial Officer (formerly Edward Reich). Capstone's shipment system would omit or block shipping addresses for customers subject to credit holds; this, in turn, prevented Capstone from shipping product to BPC without prior authorization. BPC would be instructed to provide a certain amount of money for deposit before a shipment would be scheduled. Cash had to be in the BPC account prior to shipping any product.[2]

32.   In addition, Defendants' statements about Capstone's "backlog" had also been materially misleading. Defendants frequently identified the company's backlog as a strong indicator of positive current and future performance, despite the fact that the backlog included orders from BPC for which payment was not reasonably assured and order fulfillment appeared exceedingly unlikely. Despite concerns over BPC's ability to pay, Capstone rarely and infrequently removed BPC's orders from its backlog.[3]

33.   Defendants repeatedly misrepresented Capstone's financial operations and, in particular, its revenue from BPC and usefulness of the backlog in terms of evaluating current financial health and predicting future financial performance. In order to recognize the revenue from its transactions with BPC, SABs 101 and 104 and the SEC Codification of Staff Accounting Bulletin, Topic 13 criterion required "collectibility [to be] reasonably assured." However, this requirement was not satisfied at the time the revenue at issue was recognized or

---

[2] Plaintiffs obtained the factual information alleged in Paragraphs 30 and 31 from a former employee of Capstone. Capstone employed this former employee ("FE1") as a Customer Service Director from May 2014 until October 2015. FE1 reported to Senior Vice President of Customer Service, Paul Campbell. FE1 was responsible for managing sales of aftermarket products. FE1 also managed Capstone's call center that received calls from distributors and customers in need of assistance with Capstone's turbines. Plaintiffs' counsel interviewed FE1 with assistance from a licensed investigator prior to commencing this action.

[3] Plaintiffs obtained the factual information alleged in Paragraph 32 from a former employee of Capstone. Capstone employed this former employee ("FE2") as an Order Manager from April 2001 to December 2015. FE2 reported to Sales Inventory Operations Planning Manager, Doug Fredriksen. FE2 was responsible for managing Capstone's backlog, among other things. Plaintiffs' counsel interviewed FE2 with assistance from a licensed investigator prior to commencing this action.

SECOND AMENDED COMPLAINT

at the time Defendants made statements to Plaintiffs about Capstone's revenue and/or backlog. BPC was already on a credit hold, which called into question BPC's ability to pay for products as well as the legitimacy of Capstone's backlog.

**B.    Materially False and Misleading Statements**

*April 29, 2014 – Direct Conversation*

34.    On April 29, 2014, representatives from FiveT and Deep Field Fund participated in a conference call with Defendant Jamison and Mr. Reich.

35.    During the conference call, Jamison and Mr. Reich provided FiveT and Deep Field Fund with information concerning Capstone's operations and finances.

36.    Jamison told FiveT and Deep Field Fund the following information:

a.    Since joining Capstone as its Chief Executive Officer in 2006, Jamison had been "growing revenue by adding new distribution." Capstone's distributors increased from 20 to 99 during Jamison's tenure at the company;

b.    Jamison grew Capstone's revenue from approximately $20 million to approximately $130 million during his tenure at the company. Jamison's goal was to "keep growing the company roughly at 20% revenue growth a year" going forward;

c.    Capstone's sales to Europe were much bigger before business conditions began to change. For example, "[Capstone's] European business and Russia together dropped from $40 million annually to $20 million." The slow economy in Europe impacted Capstone's sales, "[i]t's been coming back over the last two years"; and

d.    The political situation in Russia had not impacted Capstone's sales. Although a "potential problem" could arise if U.S.-Russian relations "continue[d] to deteriorate," the sanctions had not impacted Capstone's business. Capstone's Russian distributor was "still paying his bills and buying product."

SECOND AMENDED COMPLAINT

37.     Mr. Reich told FiveT and Deep Field Fund the following information:

a.      Capstone's annual "run rate" (revenue) was "$21 million" when Jamison joined in 2006 and had grown to "$133 million" as of March 2014;

b.      Capstone's "backlog ended in March [2014]" was "$172 million, which [was] a record backlog for [Capstone]." The backlog showed substantial growth year-over-year. Capstone's book-to-bill ratio in terms of orders was "healthy" at 1.2:1 (*i.e*, for every 1.2 new orders Capstone completed 1 sale). The "backlog size" was "a good indicator for what [the company] should expect [its] revenue to look like in this fiscal [2015] year";

c.      Jamison and Mr. Reich were "targeting a 35% growth margin with operating expenses at 20% of revenue and 15% going to bottom line pre-tax net income"; and

d.      Capstone's revenue slowed down during 2013 and 2014 due to the climate in European markets, but was starting to recover. "[A]bout 55%" of Capstone's sales were "outside of the United States," with "Europe account[ing] for about 9.5% last fiscal year, with Russia being another 11% . . . and Asia was about 7%."

38.     Jamison and Mr. Reich also told FiveT and Deep Field Fund that Capstone was attempting to raise capital by selling shares in a secondary offering in order to:

a.      Increase Capstone's balance sheet for the purpose of "mak[ing] sure that [Capstone's] customers aren't concerned about [the company's] ability to perform going forward" in terms of honoring its warranty and/or maintenance commitments for the products that it sold;

b.      Avoid a "going concern opinion" from their auditor who was "starting [their] year-end audit now"; and

c.      Improve the terms of its $15 million revolving line of credit with Wells Fargo which had reached a balance of $13.2 million as of March 2014. Jamison and Mr. Reich wanted to "reduce the restrictions" on the line of

credit that prohibited Capstone from "borrow[ing] more than 80% of [the company's] outstanding cash balance." Accordingly, selling shares to FiveT and Deep Field Fund would increase Capstone's cash balance and, in turn, "effectively give [the company] more borrowing capacity."

39.     FiveT and Deep Field Fund relied on the above information provided by Jamison and Mr. Reich when deciding to purchase Capstone shares.

40.     FiveT's and Deep Field Fund's reliance on the information from Jamison and Mr. Reich was reasonable under the circumstances. Jamison and Mr. Reich were Capstone's Chief Executive Officer and Chief Financial Officer at the time of the conversation and, as such, were believed to have the most current and accurate information concerning Capstone's operations and finances given their day-to-day management and overall responsibility for the company.

41.     The information provided by Jamison and Mr. Reich during the April 29, 2014 conference call induced FiveT to purchase 9,000,000 shares of Capstone stock on May 1, 2014.

42.     The information provided by Jamison during this conversation induced Deep Field Fund to purchase 18,825,000 shares of Capstone stock on May 1, 2014.

43.     Defendant Jamison's statements during the conversation described above were materially misleading. At no point during the conversation did Jamison disclose that Capstone's revenue or backlog was artificially inflated due to the fact that revenue due from BPC was potentially uncollectible. Jamison did not disclose that BPC was, at this point in time, already subject to a credit hold and that, as a result, Defendants had improperly recognized revenue on its sales to BPC or that Capstone's revenue and accounts receivable were overstated. To the contrary, Jamison created the false impression that BPC was paying its bills and continuing to buy product without any concern over collectability.

### *June 12, 2014 – Annual Report*

44.     On June 12, 2014, Capstone filed its 2014 Form 10-K and 2014 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the company's 2014 fiscal year: a) "Revenue" of $133.1 million; b) "Product Revenue" of $108.8 million; and c) "Accounts Receivable" of $28.0 million. Additionally, Capstone reported the following

financial results for the company's 2014 fiscal fourth quarter: a) "Revenue" of $36.4 million; and b) "Product Revenue" of $30.0 million.

45.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate: a) that BPC had already been placed on a credit hold; b) that Defendants had improperly recognized revenue on its sales to BPC; c) that Capstone's revenue and accounts receivable were overstated; d) that Capstone should have been accounting for its revenue from sales to BPC on a cash basis; e) that Capstone's accounts receivable did not represent their fair value and would not be collected in 90 days per Capstone's standard payment terms; and f) that Capstone's financial statements were materially false and misleading and not presented in accordance with GAAP and Capstone's stated revenue recognition policy.

46.     On June 12, 2014, the Company's 2014 Form 8-K, in relevant part, stated: "President and Chief Executive Officer Darren Jamison commented, 'Capstone achieved another banner year for business development and margin expansion in Fiscal 2014, ending the year with record quarterly product revenue and the second highest quarter for total revenue in company history. We also set new annual records for revenue and gross margin while entering Fiscal 2015 with solid backlog of $171.6 million, also a company record.'" Capstone provided the same information in its 2014 Form 10-K.

47.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate that the backlog included stale orders from BPC that were unlikely to be filled or paid for. Accordingly, it was misleading for Defendants to portray the backlog as a means for gauging Capstone's present or future success.

*August 7, 2014 – Quarterly Report*

48.     On August 7, 2014, the company filed its Q1 2015 Form 10-Q and Q1 2015 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the company's 2015 fiscal first quarter: a) "Revenue" of $23.3 million; b) "Product Revenue" of $17.6 million; and c) "Accounts Receivable" of $24.2 million.

49.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate: a) that BPC had already been placed on a credit hold; b) that Defendants had improperly recognized revenue on its sales to BPC; c) that Capstone's revenue and accounts receivable were overstated; d) that Capstone should have been accounting for its revenue from sales to BPC on a cash basis; e) that Capstone's accounts receivable did not represent their fair value and would not be collected in 90 days per Capstone's standard payment terms; and f) that Capstone's financial statements were materially false and misleading and not presented in accordance with GAAP and Capstone's stated revenue recognition policy.

50.     On August 7, 2014, the Company's Q1 2015 Form 8-K, in relevant part, stated "Record Product Backlog of $175.2 Million at June 30, 2014." Capstone provided the same information in the Company's Q1 2015 Form 10-Q.

51.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate that the backlog included stale orders from BPC that were unlikely to be filled or paid for. Accordingly, it was misleading for Defendants to portray the backlog as a means for gauging Capstone's present or future success.

### *November 6, 2014 – Quarterly Report*

52.     On November 6, 2014, the company filed its Q2 2015 Form 10-Q and Q2 2015 Form 8-K. Therein, Capstone, in relevant part, reported the following financial results for the company's 2015 fiscal second quarter: "Accounts Receivable" of $23.2 million. Additionally, Capstone's Q2 2015 Form 10-Q and Q2 2015 Form 8- K, in relevant part, stated that the company's revenue for the first six fiscal months of 2015 was $55.5 million.

53.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate: a) that BPC had already been placed on a credit hold; b) that Defendants had improperly recognized revenue on its sales to BPC; c) that Capstone's revenue and accounts receivable were overstated; d) that Capstone should have been accounting for its revenue from sales to BPC on a cash basis; e) that Capstone's accounts receivable did not represent their fair value and would not be collected in 90 days per

Capstone's standard payment terms; and f) that Capstone's financial statements were materially false and misleading and not presented in accordance with GAAP and Capstone's stated revenue recognition policy.

54.     On November 6, 2014, the Company's Q2 2015 Form 8-K, in relevant part stated: "President and Chief Executive Officer Darren Jamison commented, 'The second quarter of Fiscal 2015 was a vast improvement over the first quarter in terms of the timing of shipments and overall sales volume and revenue. Gross margin increased 240 basis points year-over-year despite softer revenue, a direct result of the substantial operational improvements we are continuing to make to reduce our manufacturing costs. Backlog remains high, which is a key leading indicator of future revenue. Based on our order flow and pipeline, we believe that we will return to year-over-year revenue growth and advance toward profitability in the second half of Fiscal 2015, typically our strongest quarters of the year.' . . . . Capstone's backlog as of September 30, 2014 was $172.3 million, compared to $175.2 million at June 30, 2014, and $149.8 million at September 30, 2013." Capstone provided the same information in the Company's Q2 2015 Form 10-Q.

55.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate that the backlog included stale orders from BPC that were unlikely to be filled or paid for. Accordingly, it was misleading for Defendants to portray the backlog as a means for gauging Capstone's present or future success.

### February 5, 2015 – Quarterly Report

56.     On February 5, 2015, the company filed its Q3 2015 Form 10-Q and Q3 2015 Form 8-K. Therein, Capstone, in relevant part, reported "Accounts Receivable" of $21.6 million for the company's 2015 fiscal third quarter. Additionally, Capstone's Q3 2015 Form 10-Q and Q3 2015 Form 8- K, in relevant part, stated that the company's revenue for the first nine fiscal months of 2015 was $80.6 million.

57.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate: a) that BPC had already been placed on a credit hold; b) that Defendants had improperly recognized revenue on its sales to BPC; c) that Capstone's

revenue and accounts receivable were overstated; d) that Capstone should have been accounting for its revenue from sales to BPC on a cash basis; e) that Capstone's accounts receivable did not represent their fair value and would not be collected in 90 days per Capstone's standard payment terms; and f) that Capstone's financial statements were materially false and misleading and not presented in accordance with GAAP and Capstone's stated revenue recognition policy.

58.     On February 5, 2015, the Company's Q3 2015 Form 8-K, in relevant part, stated: "Capstone's product backlog as of December 31, 2014 was $175.5 million, compared to $172.3 million at September 30, 2014, and $160.4 million at December 31, 2013." Capstone provided the same information in the Company's Q3 2015 Form 10-Q.

59.     These statements were materially false and/or misleading when made because Defendants failed to disclose or indicate that the backlog included stale orders from BPC that were unlikely to be filled or paid for. Accordingly, it was misleading for Defendants to portray the backlog as a means for gauging Capstone's present or future success.

### *March 11, 2015 – Direct Conversation*

60.     On March 11, 2015 at approximately 9:00 a.m. PT, while attending the 27th Annual ROTH Conference in Dana Point, California, FiveT (through a representative) engaged in a conversation with Defendant Jamison. During the conversation, Jamison discussed Capstone's revenue and operations. Jamison also discussed Capstone's Russian distributor, BPC, but did not disclose that BPC was delinquent with respect to money owed to Capstone or that Capstone had placed a credit hold on BPC.

61.     Defendant Jamison's statements during the conversation described above were materially misleading. At no point during the conversation did Jamison disclose that Capstone's revenue or backlog was artificially inflated due to the fact that revenue due from BPC was potentially uncollectible. Jamison did not disclose that BPC was, at this point in time, already subject to a credit hold and that, as a result, Defendants had improperly recognized revenue on its sales to BPC or that Capstone's revenue and accounts receivable were overstated.

SECOND AMENDED COMPLAINT

62. Prior to FiveT's March 11, 2015 conversation with Jamison, FiveT had started selling shares of Capstone stock that it had acquired on May 1, 2014. Defendants' statements caused FiveT to reverse its course of conduct and, instead of selling shares, purchase 1,000,000 additional shares of Capstone stock between February 2015 and May 2015.

## C.   <u>Additional Scienter Allegations</u>

63. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Capstone were materially false and misleading; knew that such statements or documents would be relied upon; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents. Defendants, by virtue of their access to or actual knowledge of information reflecting the true facts regarding Capstone, participated in the fraudulent scheme alleged herein.

64. The United States District Court for the Central District of California recently held that allegations similar to those herein, among others, were sufficient to support an adequate inference of scienter against Capstone and Jamison in *In re Capstone Turbine Corp. Securities Litigation*, No. 2:15-cv-08914-DMG-RAO. Plaintiffs incorporate by reference those allegations of scienter.

65. The scienter allegations in the above-reference case, which apply here with equal force, are as follows:

(a) The purported revenue from the sales to BPC constituted material portions of Capstone's total revenue. Defendants were aware of the particulars of transactions that comprised these portions of the company's revenues. Alternatively, if the Individual Defendants were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs;

(b) Sales to BPC accounted for material portions of Capstone's accounts receivables. Defendants were aware of the particulars, including the payment terms (or lack thereof) and BPC's ability to pay for the

receivables at issue. Alternatively, if the Individual Defendants' were unaware of these particulars, this ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs;

(c)     The Individual Defendants were actively involved in the company's sales efforts and were in routine communication with BPC at a relevant times. Due to the constant communications with BPC's representatives, the most probable inference is that the Individual Defendants had knowledge of, or were reckless in not knowing, the nature and terms of its transactions with BPC;

(d)     Defendant Jamison had to personally approve discounts of over $100,000. The transactions at issue exceeded this limit and, therefore, Defendant Jamison must have approved of the sales before they were booked. This supports an inference that Defendant Jamison had knowledge of, or was reckless in not knowing, the nature and terms of its transactions with BPC; and

(e)     Capstone's survival depended on its access to and ability to raise funds needed for continued operations and its primary access to capital was credit facilities with Wells Fargo. Since the amount of credit available to Capstone was partially dependent on its cash balance and accounts receivable, Defendants were incentivized to raise cash and overstate or not write down their accounts receivable so that the company had continued access to capital or would be compliant with the financial and restrictive covenants under these credit facilities.

**D.     Reliance**

66.     Plaintiffs reasonably relied upon the foregoing misrepresentations and/or materially misleading omissions.

67. Plaintiffs relied on the statements made by Defendant Jamison (and other Individual Defendants, including Does) during the conversations on April 29, 2014 and March 11, 2015. Jamison's statements induced Plaintiffs to purchase the shares that it did on May 1, 2014. In particular, Jamison's statements about Capstone's revenue (and omissions about the collectability from BPC) during April 29, 2014 induced Plaintiffs to buy Capstone stock. Similarly, Jamison's statements about Capstone's revenue (and omissions about the collectability from BPC) during March 11, 2015 induced FiveT to acquire additional shares of Capstone stock at artificially inflated prices.

68. Defendants' other public statements, including statements made in quarterly and annual reports filed with the SEC, induced FiveT to purchase additional Capstone stock at various points during the relevant time period. Within these filings with the SEC, FiveT relied upon Capstone's revenue and accounts receivable. These data points were important to FiveT because they communicated important information about Capstone's financial strength.

69. Plaintiffs would have altered their course of conduct with respect to their investments in Capstone had Defendants disclosed the fact that collectability from Capstone was not reasonably assured and that Capstone's revenue and accounts receivable was artificially inflated. In particular, Plaintiffs would not have purchased Capstone stock for the prices they paid, if at all, had Plaintiffs discovered the truth prior to their purchases.

**E.   Loss Causation**

70. The market for Capstone securities was open, well developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose, Capstone securities traded at artificially inflated prices at all relevant times. Plaintiffs purchased Capstone securities relying upon the integrity of the market prices of Capstone securities and market information relating to Capstone, and was damaged as a result.

71. Plaintiffs also purchased Capstone securities relying upon the integrity and accuracy of the information provided to them by Defendants prior to their purchase of Capstone stock, and was damaged as a result.

17

SECOND AMENDED COMPLAINT

72.     In hindsight, the truth regarding Capstone's financial condition was partially revealed, and/or the concealed risks materialized, on or about: August 7, 2014; June 15, 2015; October 1, 2015; and November 5, 2015. As a direct result of these partial disclosures, the price of Capstone's stock declined precipitously on heavy trading volume.

73.     On August 7, 2014, the company issued a press release entitled, "Capstone Turbine Announces First Quarter Fiscal Year 2015 Operating Results; Record Product Backlog of $175.2 Million at June 30, 2014." Additionally, on August 7, 2014, the company filed with the SEC its Q1 2015 Form 10-Q. Therein, the company disclosed, amongst others, that it had only collected approximately $1.6 million from BPC for the quarter, the company's days sales outstanding (or DSO) was increasing (as well as the DSO for BPC's receivables), and Capstone's accounts receivable were $24.2 million. On this news, shares of Capstone declined $4.40 per share, or 15.5%, to close at $24.00 per share on August 8, 2014, on unusually heavy volume.

74.     On June 15, 2015, the company issued a press release entitled, "Capstone Turbine Announces Fourth Quarter and Fiscal Year 2015 Operating Results." Additionally, the company's 2015 Form 10-K filed with the SEC on the same day, in relevant part, stated: "During the three months ended March 31, 2015, we recorded approximately $7.1 million with respect to the accounts receivable allowance from BPC. We determined that the collectability of this accounts receivable balance was not reasonably assured based on BPC's recent payment history and because the impact of the steep decline of the Russian ruble could continue to negatively impact its ability to pay its outstanding accounts receivable balance. . . . The company recorded bad debt expense of approximately $10.1 million, $0.2 million and $0.3 million for the years ended March 31, 2015, 2014 and 2013, respectively." Additionally, during a conference call with investors and analysts on June 15, 2015, Defendant Jamison, in relevant part, stated: "…let's talk about BPC in general. We took a very large AR hit this quarter that is a reserve not a write-off which is there's obviously a very big difference." On this news, shares of Capstone declined $1.81 per share, or 16.1%, to close at $9.40 per share on June 16, 2015, on unusually heavy volume.

75.     On October 1, 2015, the company issued a press release entitled, "With Shipments Delayed Until Fiscal Third Quarter Capstone Expects Fiscal Second Quarter Financial Results To Be Below Expectations." Therein, the company, in relevant part, stated: " . . . In addition, the Company received no significant payments from its Russian distributor, who until recently was one of their largest customers." On this news, shares of Capstone declined $1.74 per share, or 25.5% to close at $5.06 per share on October 1, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.24, or 4.8%, to close at $4.82 per share on October 2, 2015, and another $0.42, or 8.7%, to close at $4.40 per share on October 5, 2015, on heavy volume.

76.     On November 5, 2015, the company issued a press release entitled, "Capstone Turbine Reports Second Quarter of Fiscal 2016 Financial Results." Therein, the company, in relevant part, stated: "Total revenue of $17.9 million compared with $32.2 million in the year-ago second quarter. This quarter's results did not include any orders from Russia, which contributed $6.7 million in revenue during last year's second quarter. Total backlog as of September 30, 2015 was $104.8 million compared with $172.3 million as of September 30, 2014 and $160.5 million as of June 30, 2015. The Company removed $52.4 million from backlog from BPC Engineering, its Russian distributor, this quarter." Additionally, on November 5, 2015, the company filed its Q2 2016 Form 10-Q and held an investor conference call which repeated the information about Capstone's revenue and backlog, among other things. On this news, shares of Capstone declined $0.31 per share, or 7.2% to close at $3.99 per share on November 6, 2015 on unusually heavy volume. The stock price continued to decline, falling by $0.95, or more than 23%, to close at $3.04 on November 9, 2015, another $0.25, or approximately 8%, to close at $2.79 on November 10, 2015, and another $0.62, or approximately 22%, to close at $2.17 per share on November 11, 2015 on heavy volume.

77.     At all relevant times, Defendants concealed material information from Plaintiffs about orders received by Capstone from BPC as well as BPC's ability to pay for its orders. The above-listed disclosures revealed, in part, that Defendants' statements were materially misleading. Each statement revealed additional information concerning the scope and extent

of BPC's payment problems and the impact these problems had on Capstone's financial strength. The risk pertaining to BPC's non-payment, which Defendants concealed through their false and/or misleading statements, ultimately materialized on November 5, 2015 with the removal of $52.4 million of BPC orders from Capstone's backlog.

*          *          *

78.     Plaintiffs did not discover the fraud and deceit practiced on them until on or about February 9, 2018 when the United States District Court for the Central District of California denied a motion to dismiss filed by, among others, Capstone in the case styled *In re Capstone Turbine Corp. Securities Litigation*, No. 2:15-cv-08914-DMG-RAO.

79.     Plaintiffs could not with reasonable diligence have discovered said fraud and deceit prior to April 28, 2017 because the plaintiffs in the above-referenced case did not allege until that day that BPC was subject to a credit hold from at least 2014 through 2015. On February 9, 2018, the Court denied the aforementioned motion to dismiss based, in part, on this fact, which revealed Defendants' fraud and deceit to Plaintiffs.

80.     Following the Court's decision on February 9, 2018, Plaintiffs investigated the allegations concerning the credit hold alleged by the plaintiffs in *In re Capstone Turbine Corp. Securities Litigation*, No. 2:15-cv-08914-DMG-RAO. At that point in time, Plaintiffs discovered that they had been defrauded by Defendants and thereafter promptly filed this action.

<h1 style="text-align:center"><u>COUNT I</u></h1>

<h2 style="text-align:center">Common Law Fraud and Deceit against Defendants</h2>

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

82.     Defendants violated the common law of fraud and California Civil Code §§ 1709 and 1710 through the material misrepresentations and non-disclosures alleged above, including the false and deceitful representations made about Capstone's backlog and revenue from BPC.

83.     Defendants made their material misrepresentations and non-disclosures knowing that their statements were false and misleading and with the intent to defraud Plaintiffs.

84.     The Individual Defendants engaged in the wrongful conduct alleged above as officers and/or directors of Capstone and on behalf of Capstone, and Capstone is thus responsible for their actions.

85.     Plaintiffs reasonably relied on Defendants' material misrepresentations and nondisclosures by purchasing Capstone stock.

86.     As a proximate result of relying on Defendants' material misrepresentations and non-disclosures, Plaintiffs incurred actual damages consisting of *inter alia* the loss in value of their Capstone stock.

87.     Plaintiffs seek all available remedies, damages (including punitive), and awards as a result of Defendants' fraud.

## COUNT II

### Negligent Misrepresentation against Defendants

88.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein; except those allegations alleging intentional fraud or deceit. Plaintiffs' allegations for this Count II sound in negligence and seek to hold Defendants liable for failing to act reasonably under the circumstances when making representations to Plaintiffs about Capstone.

89.     Defendants made material false statements, including, without limitation, those representations and omissions as to the financial condition of Capstone and revenue to be received from BPC.

90.     Defendants knew or should have known that their representations were material to Plaintiffs to the extent that Plaintiffs would rely upon the misstatements when making investment decisions concerning Capstone stock. Public disclosures made by a public company's executive officers and directors are often the only means available for stockholders to inform themselves while making investment decisions.

91.     Defendants' misstatements or omissions were false in that, among other reasons, Defendants were aware or should have been aware of the fact that BPC was unable to pay

Capstone money that it owed and, as a result, Capstone's financial statements were materially incorrect.

92.     Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of their disclosures about Capstone. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements made misleading, and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, Defendants knew or should have known that their statements were materially misleading and would materially affect Plaintiffs' decisions concerning Capstone stock.

93.     Defendants were negligent in making the false and misleading misstatements and omissions.

94.     At the time of the misrepresentations and omissions of material facts by Defendants, Plaintiffs were ignorant of their falsity and believed them to be true.

95.     As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs have suffered damages to be determined at trial as a result of buying Capstone stock upon misinformation.

96.     Plaintiffs seek all available remedies, damages, and awards as a result of Defendants' negligent misrepresentations.

## COUNT III

97.     Plaintiff Deep Field Fund repeats and realleges each and every allegation contained above as if fully set forth herein.

98.     Defendants offered to sell and sold Capstone stock to Deep Field Fund.

99.     Defendants' offer and sale of Capstone stock to Deep Field Fund was made by means of written and/or oral communications that included untrue statements of material fact.

100.     Defendants' offer and sale of Capstone stock to Deep Field Fund was made by means of written and/or oral communications that omitted to state material facts necessary to make other statements made, in the light of the circumstances under which the statements were made, not misleading.

SECOND AMENDED COMPLAINT

101.   Plaintiffs (including Deep Field Fund) did not know the facts concerning the untruths or omissions alleged above.

102.   Defendants violated California Corporations Code §25401 and, therefore, Plaintiff Deep Field Fund is entitled to damages pursuant to California Corporations Code §25501.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   Awarding compensatory damages in favor of Plaintiffs against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b)   Awarding Plaintiffs pre- and post-judgment interest, reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(c)   Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.


Dated:  November 29, 2018            LEVI & KORSINSKY, LLP

                              By:   s/ Adam M. Apton
                              Adam M. Apton (SBN 316506)
                              445 South Figueroa St., 31st Floor
                              Los Angeles, California 90071
                              Tel:  213/985-7290
                              Fax:  202/333-2121
                              Email:  aapton@zlk.com

SECOND AMENDED COMPLAINT

-and-

Nicholas I. Porritt (*to be admitted pro hac vice*)
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel: 202/524-4290
Fax: 202/333-2121
Email: nporritt@zlk.com

*Attorneys for Plaintiffs*

SECOND AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2018, I caused the foregoing SECOND AMENDED COMPLAINT to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List generated by the CM/ECF system.


        s/ Adam M. Apton
        Adam M. Apton